[Cite as *State v. Villolovos*, 2025-Ohio-2844.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-24-1192

    Appellee                                    Trial Court No.  CR 23 2913

v.

Rhaymoun Villolovos                     **DECISION AND JUDGMENT**

    Appellant                                   Decided: August 12, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Anthony J. Richardson, II, for appellant.

* * * *

**DUHART, J.**

{¶ 1} This case is before the court on appeal from the June 25, 2024 judgment of the Lucas County Common Pleas Court.  For the reasons that follow, we affirm.

**I.  Assignments of Error**

{¶ 2} Appellant, Rhaymoun Villolovos asserts the following two assignments of error for this court's review:

1)  There was insufficient evidence to convict [Villolovos].

2) [Villolovos'] conviction was against the manifest weight of the evidence.

## II. Facts and Procedural History

{¶ 3} On December 13, 2023, Villolovos was indicted with one count of passing bad checks, a violation of R.C. 2913.11(B), (E), and (F),[1] a felony of the fifth degree, as Count One; and one count of theft, a violation of R.C. 2913.02(A)(3) and (B)(2), a felony of the fifth degree, as Count Two.

{¶ 4} On January 5, 2024, Villolovos pled not guilty to the charges in the indictment. After a series of pretrial hearings, he elected to have a jury trial in the matter, which commenced on June 11, 2024.

## A. Trial

{¶ 5} The following is a summary of the testimony presented at Villolovos' trial.

{¶ 6} On August 16 and 17, 2023, Villolovos wrote four checks, totaling over $5,000, at the Menards store on Alexis Road in Toledo, Ohio. In addition, he made purchases at other nearby Menards stores, so loss prevention officers at the various Menards stores began communicating because "it just kind of seemed suspicious that he was spending such large amounts at all three different stores on one day."

{¶ 7} On August 20, 2023, Villolovos was with his wife, Keandra, when he again attempted to purchase items with a check at the Alexis Road Menards store. He was approached by Corry Grace, the front-end manager, who informed him that she would need to verify funds before he could write any more checks. She could not verify the funds with the bank because it

_____

[1] This was amended at trial to R.C. 2913.11(B), (D) and (E).

2.

was Sunday and the bank was closed, and when she requested another form of payment, Villolovos claimed he was being discriminated against and left.

{¶ 8} The checks that were presented as payment by Villolovos were returned for insufficient funds on August 21, 22, and 24, 2023.

{¶ 9} On September 20, 2023, Grace contacted Villolovos and notified him that all four checks had been returned for insufficient funds. At that time, Villolovos told Grace that he would make a payment after he sold a house.

{¶ 10} Grace reported the matter to the Toledo Police Department on September 21, 2023, as Villolovos had not come in to make a payment, and the case was assigned to Detective Eric Schwalbe. Detective Schwalbe contacted Villolovos on September 22, 2023, and Villolovos informed him that there was not enough money in his account and that he was waiting to sell a house. The detective "strongly urge[d]" Villolovos to "make good on the checks." Detective Schwalbe then communicated with Grace on October 4, 2023, and was informed that Villolovos had not made any payments in the matter. Thereafter, the detective contacted Villolovos again and gave him a few more days to make a payment, even suggesting that he make a small payment to show that he was trying. Although Villolovos stated he would do that, when Detective Schwalbe checked back with Grace after the additional days, he was told that no payments had been made, so charges were filed.

{¶ 11} Keandra testified that Villolovos flips houses for a living. She explained that he has a bank account, where she believed the profits from the sale of the houses are deposited, but they "both use the money out of it." She explained that her husband has a debit card, and when

3.

she needs money from that account, she just uses the debit card or her Cash App. She did not inform Villolovos when she took money out in August of 2023 because she "figured maybe he could see it." She also described Villolovos' demeanor on August 20, 2023, when he attempted to use a check and was stopped by Grace. Keandra stated that "[h]e was surprised because he thought the money was there," and she thought he was offended because they "do this all the time."

{¶ 12} The jury found Villolovos not guilty of Count One, passing bad checks, but guilty of Count Two, theft.

## A. Sentencing

{¶ 13} Villolovos was sentenced on July 24, 2024, to three years of community control with certain conditions, six months at the Corrections Center of Northwest Ohio, and restitution in the amount of $5,282.65.

{¶ 14} Villolovos appealed.

## III. Theft by Deception

{¶ 15} Villolovos was convicted of one count of theft by deception, in violation of R.C. 2913.02(A)(3) and (B)(2), which, in part, states that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . by deception." Deception is defined under R.C. 2913.01(A) as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another,

4.

including a false impression as to law, value, state of mind, or other objective or subjective fact."

## IV. Arguments of the Parties

{¶ 16} Villolovos contends both that the prosecution failed to present sufficient evidence and that his conviction was against the manifest weight of the evidence with respect to whether he had the intent to deprive Menards of its property at the time of each transaction. He contends that the plain language of the statute requires the State to establish his intent to deprive Menards at the time the property was taken and maintains that he did not know at the time of the transactions that his account did not have sufficient funds to purchase the items. He states that he believed his overdraft protection on his account would cover the purchases until he received money from the sale of a refurbished home.

{¶ 17} Villolovos cites to, inter alia, *City of Brooklyn v. Fouche*, 2006-Ohio-169 (8th Dist.) to support his statement that the State was required to show an intent to deprive Menards of its property at the time the property was taken. In *Fouche*, the court reversed defendant's conviction for failing to pay for food or service provided at a restaurant, holding that there was insufficient evidence to support "that when defendant took . . . [the] food he also had a purpose to deprive the restaurant of its property without paying." *Id.* at ¶ 41.

{¶ 18} Villolovos contends that, like the facts in *Fouche*, there is nothing in the record to support a finding that he knew that he did not have enough funds in his account at the time of the purchases.

5.

{¶ 19} The State reminds the court that intent can be proven by circumstantial evidence and maintains that triers of fact (in this case, the jury) may presume intent where the natural and probable consequences of Villolovos' actions were calculated to produce the achieved result.

{¶ 20} The State does not dispute that the intent must be shown at the time of the purchase. Rather, the argument asserted by the State is that it did show sufficient evidence that "Villolovos had no intention of paying for the items he purchased at the time of the purchase, that he intended to deprive the store of the goods, and that he did so by deception." The evidence the State relies upon is Villolovos' actions after the purchases. Specifically, the State points to the fact that, when he was contacted Detective Schwalbe about the bounced checks and outstanding balance, Villolovos stated he would come into the store to pay his debts, but never did. Also, Villolovos was asked to verify the funds on August 20, 2024, and if he believed the funds were in his account, "he could have used a debit card associated with his bank account," but the "fact that he did not do so tends to prove that he knew the funds were not actually in his account." The State refers to *State v. Sampson*, 2005-Ohio-5692 (8th Dist.) in support of its contention that actions taken after a theft can be used to prove intent to deceive at the time of the transaction. In *Sampson*, a hotel guest extended his stay beyond his initial reservation, and the hotel granted his requests for extensions on the basis of his assurances that he would pay. Eventually, the guest was scheduled to meet with the hotel staff regarding his account, but instead, left the night before without checking out or paying his bill. The hotel guest was convicted of violating R.C. 2913.02, and the appellate court found sufficient evidence of deception based upon, inter alia, his leaving the hotel without notifying anyone.

6.

**{¶ 21}** The State also contends that the jury did not lose its way nor create a manifest miscarriage of justice in determining its verdict. The State notes that the weight of the evidence must be determined by the court looking at the entire record, as if they were a thirteenth juror.

## V. Law and Analysis

### A. Sufficiency of the Evidence

**{¶ 22}** In cases questioning the sufficiency of the evidence, "an appellate court must consider 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Coker,* 2025-Ohio-2051, ¶ 12, quoting *State v. Brinkley*, 2005-Ohio-1507, ¶ 40. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." *State v. Jordan*, 2023-Ohio-3800, ¶ 16. *See State v. Duke,* 2021-Ohio-1552, ¶ 19 (6th Dist.).

**{¶ 23}** Villolovos contends that there is not sufficient evidence showing that he knew there was not enough money in his account. He points to statements made by Grace that when she approached him to verify funds, he was on his phone and he might "have been trying to pull up his bank account to show [her] what was in there," as well as to statements by his wife that he had overdraft protection on his account, and that she remembered Villolovos showing Grace "like his bank that day" and that he said he thought the money was there.

**{¶ 24}** The law recognizes that one's intent lies within the privacy of one's own thoughts and therefore is not susceptible of objective proof. *State v. Garner*, 74 Ohio St.3d 49, 60 (1995). Intent can be determined from the surrounding facts and circumstances, and individuals are

7.

presumed to have intended the natural, reasonable, and probable consequences of their voluntary acts. *Id*.

{¶ 25} Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found that the State proved the essential elements of theft beyond a reasonable doubt. This evidence includes Villolovos' failure to pay the money owed to Menards, or to return the property, despite telling both Grace and Detective Schwalbe that he would. Villolovos was contacted a total of three times, twice by Detective Schwalbe and once by Grace and given notice and an extended period to make right on his debts. Detective Schwalbe called Villolovos on October 4, 2023, giving him an additional four days to make some kind of effort, even suggesting to him that he make a $20-$25 payment. Villolovos told Detective Schwalbe he intended to go to Menards and make a payment and/or pay his debt, and yet he did not do so.

{¶ 26} Although Villolovos maintains that these subsequent events cannot be considered to determine his intent at the time of the purchases, we find these events support a finding of theft. Accordingly, we find Villolovos' first assignment of error not well-taken.

### B. Manifest Weight of the Evidence

{¶ 27} A verdict can be supported by sufficient evidence but still be reversed if it is against the manifest weight of the evidence. *State v. Bruce,* 2022-Ohio-909, ¶ 26 (10th Dist.). When considering whether a conviction is against the manifest weight of the evidence, the court must look at the entire record and must act as a thirteenth juror to determine whether the jury clearly lost its way in resolving conflicts, and whether its decision created a manifest

8.

miscarriage of justice such that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d. 380, 387 (1997). A court's discretionary power to grant a new trial should be exercised "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Further, the *Thompkins* court, citing *Black's Law Dictionary* at 1594 (6th Ed. 1990), set forth:

> Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.' (Emphasis sic.)

{¶ 28} Manifest weight cases do not require the court to view the evidence in the light most favorable to the State. *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.). Special deference is however given to the original trier(s) of fact. *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). This is because they are better able to observe those testifying, their demeanor, their voice inflections and gestures, and they can use these observations to weigh the credibility of the testimony. *State v. Binford,* 2003-Ohio-3021, ¶ 32. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *State v. Berry*, 2024-Ohio-5970, ¶ 26 (6th Dist.), citing *Thompkins* at 387.

{¶ 29} Considering the same facts as discussed in relation to Villolovos' sufficiency of the evidence argument, including Villolovos' failure to return the property to Menards or to pay Menards the money owed despite assurances that he would, we cannot say that the jury clearly

9.

lost its way so as to create a miscarriage of justice, nor do we find this to be an exceptional case in which the evidence weighs heavily against conviction. Therefore, Villolovos' second assignment of error is not well-taken.

## VI. Conclusion

{¶ 30} The judgment of the Lucas County Common Pleas Court is affirmed. Pursuant to App.R. 24, Rhaymoun Villolovos is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.
_____
JUDGE

Christine E. Mayle, J.
_____
JUDGE

Myron C. Duhart, J.
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.